UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------X
JACQUELYN TODARO and MARIA H.
MOSCARELLI,

                 Plaintiffs,         <u>MEMORANDUM AND ORDER</u>
                                            04-CV-2939 (JS)(WDW)
      - against -

SIEGEL FENCHEL & PEDDY, P.C.,
WILLIAM D. SIEGEL, SAUL R. FENCHEL,
TRACIE P. PEDDY, and ANDREW G. CANGEMI,

                 Defendants.
-----------------------------------X
APPEARANCES:
For Plaintiffs:          Steven Ian Locke, Esq.
                      Jeffrey I. Schulman, Esq.
                      Carabba Locke LLP
                      100 William Street, 3rd Floor
                      New York, NY 10006

For Defendants:         Philip D. Nykamp, Esq.
                      Patrick Brian Fife, Esq.
                      Twomey, Latham, Shea, & Kelly, LLP
                      33 West 2nd Street
                      P.O. Box 9398
                      Riverhead, NY 11901

                      Kevin M. Fox, Esq.
                      Russo Fox & Karl
                      400 Townline Road
                      Hauppauge, NY 11788


SEYBERT, District Judge:

       The Court held a jury trial in this matter on August 11-22, 2008.  The jury found in favor of Plaintiff Maria H. Moscarelli on her Title VII/NYSHRL claim for sex and/or pregnancy discrimination, and awarded her $203,838.70 in back pay, $500,000 in punitive damages, and $1.00 in nominal damages.  The jury also found in favor of Plaintiff Jacquelyn Todaro's Equal Pay Act claim,

awarding her $16,499.75 in damages. However, the jury found against Ms. Todaro on her Title VII claim. Defendants have now moved to set aside the verdict, and for judgment as a matter of law in their favor on all claims. For the foregoing reasons, Defendants' motion is GRANTED IN PART AND DENIED IN PART.

BACKGROUND

## I.  Maria H. Moscarelli

Ms. Moscarelli began working as a paralegal for Defendant Siegel, Fenchel & Peddy, P.C. ("the Firm") in October 1987. (Tr. 309). In or around 1995, Ms. Moscarelli was promoted, becoming head of the Firm's tax certiorari department. (Tr. 310). In this capacity, Ms. Moscarelli supervised three full-time employees, and some additional part-time workers. (Tr. 310). During the entire time she worked for the Firm, Ms. Moscarelli never once received anything in writing that reflected negatively on her job performance. (Tr. 321). And, except for 1998 and 2002, Ms. Moscarelli received salary increases every year. (Tr. 321). Those were the two years that Ms. Moscarelli was pregnant. (Tr. 321).

Ms. Moscarelli had her second child on May 4, 2003, and took 12 weeks maternity leave. (Tr. 334). She returned to work on August 11, 2003, but was terminated only 11 days later, on August 22, 2003. (Tr. 334-35). Ms. Moscarelli testified that, in her termination meeting, Defendant Tracie P. Peddy began by telling her that she "had been out quite a bit the last nine months," which Ms.

Moscarelli understood to be a reference to her maternity leave. (Tr. 335). Ms. Moscarelli also testified that, in this meeting, Ms. Peddy also expressed dissatisfaction with how Ms. Moscarelli had "handled the computer system." (Tr. 335).

Defendants claim that they terminated Ms. Moscarelli because of her poor performance. In particular, Defendants contend that Ms. Moscarelli twice failed to deliver tax appeal petitions to the Nassau County Clerk on a timely basis, nearly causing the Firm to miss filing deadlines. (Def. Br. at 6-12). In addition, Defendants argue, they realized during Ms. Moscarelli's second maternity leave that the certiorari department functioned effectively without her. (Def. Br. at 2). Defendants claim that they terminated her for these legitimate, non-discriminatory reasons, and not due to any bias against women or pregnancy.

In response, Ms. Moscarelli notes that the Firm had a Personnel Manual which set forth a "progressive diciplin[ary]" policy for addressing employee performance issues. (See Pl. Ex. 10 at 20-26). Under this policy, employees first receive a verbal warning, following by a written warning if performance does not improve, followed by probation and, only then, termination. (Id.). According to Ms. Moscarelli, she never received a written warning and was never placed on probation. (Tr. 352-354). In fact, Ms. Moscarelli testified that the only written comments she received from Defendants were thank-you notes and gifts for her hard work.

(Tr. 315-320). The Firm's failure to follow its own disciplinary policy before terminating her for alleged performance reasons, Ms. Moscarelli argues, supports a finding that the Firm's purported reasons for terminating her were pretextual.

## II. Jacquelyn Todaro

Ms. Todaro joined the Firm in August 1996, as a temporary secretary. (Tr. 69). The Firm asked Ms. Todaro to remain as a law clerk and, following her admission to the Bar, promoted her to the position of Associate attorney. (Tr. 69-70). Between 1996 and 2002, Ms. Todaro received a substantial salary increase every year. (Tr. 155). By 2002, she was earning $102,500 per year. (Tr. 154). In November 2002, she told the Firm that she was pregnant. (Tr. 155). On January 1, 2003, the Firm cut Ms. Todaro's salary by 25%, to $76,875 per year. At the same time, the Firm increased the compensation of Robert Litt, a male associate, to approximately $97,000 per year. (Tr. 653). Ms. Todaro began a maternity leave on April 25, 2003, but continued receiving her reduced salary through May 24, 2003. On July 21, 2003, Ms. Todaro resigned from the Firm, claiming constructive discharge due to sex and pregnancy discrimination, and an alleged hostile work environment.

## III. The Firm's Treatment of Women

At trial, Plaintiffs adduced significant evidence indicating both that the Firm's employees made repeated derogatory comments about women, and that the Firm itself treated men and

4

women differently.  Among other things, testimony indicated that:

- Defendant Bill SIEGEL consistently made comments regarding how female attorneys are "difficult" and/or "obnoxious." (Tr. 80-82, 633-634, 709-710, 962);

- On one occasion, Mr. SIEGEL approached Ms. Todaro and two other female attorneys and asked "what are you ladies doing here so late? Don't you have husbands or boyfriends to go home to?" (Tr. 82);

- Mr. SIEGEL suggested that Ms. Todaro should buy a "very skimpy . . . playboy bunny outfit" for her upcoming trip. (Tr. 83);

- On one occasion, Mr. SIEGEL asked why "they let women into the courtroom." (Tr. 413);

- Another attorney, Andy Cangemi commented to female attorneys about paying them too much. (Tr. 93);

- Mr. Cangemi did not offer a female law clerk a full-time position because he did not want another female associate. (Tr. 94);

- Defendant Saul Fenchel called one female partner a "slut" and referred to her and Defendant Tracie Peddy as "joyless shiksas[1]." (Tr. 85);

- Mr. Fenchel also suggested that a certain paralegal's pregnancy created "the perfect opportunity to get rid of her," and that this paralegal was subsequently fired shortly after she returned from maternity leave. (Tr. 88);

- Mr. Fenchel took a male associate under his wing, and provided him with opportunities and assistance that he did not provide to female associates. (Tr. 86-87);

- When a female associate left on maternity leave, the Firm transferred her to a smaller office and

---

[1] According to Merriam-Webster Dictionary "Shiksa" is used often as a disparaging term referring to a non-Jewish girl or woman.

awarded her larger office to a newly-hired male associate. (Tr. 144);

- Former partner Karen Strom testified that, while employed with the Firm, she experienced various kinds of discriminatory treatment, including insulting sexual innuendo and lower pay than her male peers. (Tr. 415-422).

On this motion, the Court takes no position regarding whether this conduct occurred. It is enough that this testimony was in evidence for the jury to consider. Defendants' liability turns on the jury's credibility determinations, which the Court "cannot disturb" unless the verdict was "egregious." See James v. Melendez, 567 F. Supp. 2d 480, 484 (S.D.N.Y. 2008) (citing DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 134 (2d Cir. 1998)).

## DISCUSSION

I.  Standard of Review

"In ruling on a motion for judgment as a matter of law, a district court must consider the evidence in the light most favorable to the non-movant and draw all reasonable inferences the jury could have drawn." Cweklinsky v. Mobil Chem. Co., 364 F.3d 68, 75 (2d Cir. 2004). "The district court may set aside a verdict only where there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or where the evidence overwhelmingly compels a different verdict." Id. (internal citations and quotations omitted).

6

II.  <u>Ms. Moscarelli's Title VII Claim</u>

        Defendants first argue that the jury erred in finding for
Ms. Moscarelli on her Title VII claim, because: (1) they had a
legitimate non-discriminating reason for terminating her; and (2)
Ms. Moscarelli failed to introduce evidence to show that this
purported reason was a pretext.  But Defendants are mistaken.

        True, Defendants did introduce evidence, through
testimony, that they terminated Ms. Moscarelli because she almost
missed the filing deadline on tax certiorari petitions two years in
a row, and because they realized during her maternity leave that
the certiorari department functioned fine without her.  But Ms.
Moscarelli countered Defendants' argument by introducing evidence
that could have led a rational jury to believe that Defendants'
purported reason was a pretext.  Specifically, Ms. Moscarelli set
forth that: (1) Defendants failed to follow their own "progressive
discipline" policy, which required Defendants to take several
intermediate steps before terminating her for poor performance; (2)
she received several written letters of thanks and appreciation for
her work, but no written negative feedback; (3) Defendants awarded
her a raise every year except for the two years she was pregnant;
(4) Defendants took adverse actions against other pregnant women
who took advantage of maternity leave; (5) several Firm employees
made derogatory comments towards women; (6) other women, including
Ms. Strom, a former partner, believed that the Firm discriminated

against them. See supra 3-6. There was nothing "egregious" in the jury crediting this evidence, rather than the Defendants' own self-serving testimony. James, 567 F. Supp. 2d. at 484.

Defendants also argue that Ms. Moscarelli's pregnancy discrimination claim fails as a matter of law because Ms. Moscarelli was no longer pregnant when they terminated her. But this argument fails for two principal reasons. First, the jury found that Ms. Moscarelli was a victim of "gender or pregnancy" discrimination.[2] Thus, given the evidence above, the jury could have based its verdict on sex discrimination – not any discrimination related to Ms. Moscarelli's former pregnancy. Second, Defendants are mistaken that an employer can avoid liability for pregnancy discrimination by waiting until after the pregnancy ends before taking adverse action. See, e.g., Infante v. Ambac Financial Group, 03-CV-8880, 2006 WL 44172, *4-5 (S.D.N.Y. 2006) ("the adverse employment action based on Infante's pregnancy need not have occurred during her pregnancy or even during a period in which she suffered from a related medical condition"); Smith v. K & F Industries, Inc., 190 F. Supp. 2d 643, 649 (S.D.N.Y. 2002) (whether employee who was terminated after giving birth suffered

---

[2] In this regard, it is notable that Defendants themselves did not seek any special interrogatories to distinguish between sex and pregnancy discrimination. Instead, Defendants' proposed jury verdict form asked the jury to answer: "Has Maria Moscarelli proven by a preponderance of the evidence that she was the victim of sex or pregnancy discrimination?" a question functionally identical to the one the jury ultimately decided.

pregnancy discrimination was a question of fact). Rather, liability continues to exist if Ms. Moscarelli's former pregnancy remained "in the thoughts and actions of those responsible for firing her," and was a contributing factor in the decision to terminate her. <u>See</u> 1 Emp. Discrim. Coord. Analysis of Federal Law § 3:16; <u>Everson v. New York City Transit Authority</u>, 02-CV-1121, 2007 WL 539159, *10 (E.D.N.Y. 2007) (under Title VII, discrimination need only be a "contributing factor in the employer's decision"). Here, a reasonable jury certainly could have found that Ms. Moscarelli's pregnancy contributed to the decision to terminate her. Indeed, Ms. Moscarelli testified that, at her termination meeting, she was informed that she was being fired – in part – because she "had been out quite a bit the last nine months." (Tr. 335).

## III. <u>The Jury's Award of Back Pay to Ms. Moscarelli</u>

Defendants also challenge the jury's back pay award to Ms. Moscarelli. Defendants argue that: (A) the jury's verdict was "advisory"; (B) Ms. Moscarelli failed to mitigate her damages; and (C) the evidence does not support the jury's $203,838 award. The Court addresses each of these arguments, in turn.

### A. <u>The Jury's Back Pay Award was Advisory</u>

Because back pay awarded under Title VII is considered an equitable remedy, a "party is generally not entitled to a jury determination on the question." <u>Broadnax v. City of New Haven</u>, 415

F.3d 265, 271 (2d Cir. 2005).  The Court may submit the question of back pay to the jury as an advisory verdict, or for a binding verdict if both parties consent or fail to object.  Id. at 272. But here, Defendants expressly moved to bar the jury from calculating any back pay award.  See 04-CV-2939, Docket No. 50 (E.D.N.Y. July 2, 2008).  Thus, the Court construes the jury's verdict as advisory only, and reviews its back pay award de novo. See, generally, Hine v. Mineta, 238 F. Supp. 2d 497, 499 (E.D.N.Y. 2003) (it is within the Court's discretion to adopt or reject advisory verdicts).  Having done so, the Court modifies it as discussed below.

    B.    **Defendants Failed to show that Ms. Moscarelli Neglected to Mitigate her Damages**

Defendants contend that, because Ms. Moscarelli supposedly failed to mitigate her damages, she was not entitled to any back pay award – or that her award should have been reduced to the extent that she failed to mitigate.  But Defendants are mistaken.

As an initial matter, the Court notes that, although Ms. Moscarelli had a statutory duty to mitigate her damages, Defendants bore the burden at trial to show that she failed to meet this duty. Defendants could have shown Ms. Moscarelli's failure to mitigate in two ways.  First, Defendants could have shown that: (1) suitable work existed, and (2) Ms. Moscarelli did not make reasonable efforts to obtain it.  Dailey v. Societe Generale, 108 F.3d 451,

456 (2d Cir. 1997). Alternatively, Defendants could have shown that Ms. Moscarelli made no "reasonable efforts" to locate a suitable position. <u>Greenway v. Buffalo Hilton Hotel</u>, 143 F.3d 47, 54 (2d Cir. 1998).

Here, Defendants fail to identify any evidence in the record to support that they met their burden under either method. When cross-examining Ms. Moscarelli, Defendants failed to ask even a single question concerning her mitigation efforts. (Tr. 365-403). Nevertheless, Defendants argue that Ms. Moscarelli failed to mitigate her damages because she testified on direct that she could have accepted a full-time position that paid in the "thirties," instead of accepting the two part-time jobs that paid her an average of $21,000 each year. But, Ms. Moscarelli's Title VII duty to mitigate was not "onerous," and did not require her to take any job she was offered. <u>N.L.R.B. v. Thalbo Corp.</u>, 171 F.3d 102, 112 (2d Cir. 1999). Rather, Ms. Moscarelli was entitled to "reasonably reject[]" a position that paid "significantly lower wages." <u>Wills-Hingos v. Raymond Corp.</u>, 104 Fed. Appx. 773, 776 (2d Cir. 2004)[3] (unpublished); <u>see also</u> <u>Kuper v. Empire Blue Cross & Blue Shield</u>, 99-CV-1190, 2003 WL 359462, *6 (S.D.N.Y. 2003) (plaintiffs entitled to reject jobs that are not "suitable," and suitability requires,

---

[3] As this case is unpublished, the Court does not consider it binding, or, for that matter, even persuasive authority. The Court cites <u>Wills-Hingos</u> only because this case reflects the Court's own understanding that the law does not require Title VII plaintiffs to accept substantially lower paying employment.

in part "virtually identical . . . compensation") (citations and quotations omitted); <u>Skaggs v. Hartford Financial Group, Inc.</u>, 1999-CV-3306, 2001 WL 1665334, *16 (E.D. Pa. 2001); <u>Moore v. University of Notre Dame</u>, 22 F. Supp. 2d 896, 907 (N.D. Ind. 1998) (no failure to mitigate where plaintiff rejected job that paid "significantly less" than previous employment). This is particularly true because, as Ms. Moscarelli testified (and Defendants failed to dispute or refute), the full-time position would not have "worked out" given its lower hourly rate when compared to the cost of child care. (Tr. 356); <u>see also</u> <u>Wills-Hingos</u>, 104 Fed. Appx. at 776 (factoring in the cost of child care in holding that plaintiff was not required to take a lower paying position); <u>Vera-Lozano v. International Broadcasting</u>, 50 F.3d 67, 71 (1st Cir. 1995) (plaintiff who voluntarily resigned position did not fail to mitigate damages because "job provided no additional economic support given the irregular work schedule, the cost of child care for her two children and the low pay"). Thus, Ms. Moscarelli's failure to accept the full-time position does not amount to a failure to mitigate.

Defendants also argue that Ms. Moscarelli has failed to mitigate because she has remained in that part-time position for five years, and has never returned to full-time work. Def. Br. at 20. But Defendants adduced no testimony or other evidence from Ms. Moscarelli indicating that she has failed to seek suitable full-

time work since acquiring her two part time positions. And, because Defendants bore the burden of showing Ms. Moscarelli's failure to mitigate, the Court cannot infer that Ms. Moscarelli's continued part-time work resulted from a personal choice rather than the failure to locate suitable full-time work.

Accordingly, the Court finds that Defendants failed to meet their burden in showing that Ms. Moscarelli failed to fully mitigate her damages. In determining an appropriate back pay award, the Court thus considers only Ms. Moscarelli's actual earnings from her two part-time positions.

C. <u>Ms. Moscarelli's Back Pay Award</u>

Ms. Moscarelli was earning $64,000 at the time of her termination. After her termination, Ms. Moscarelli worked at two part-time jobs, earning an average of roughly $21,000 per year. The jury awarded Ms. Moscarelli $203,838.70 in back pay.

It is unclear how the jury arrived at this precise figure. There are many ways to calculate a back pay award, and neither party requested that the jury report their exact mathematical calculations. Because the jury's verdict was strictly advisory, the Court has not attempted to reverse engineer the jury's reasoning. Instead, the Court has started from scratch to deduce an appropriate back pay award based on the evidence.

Plaintiffs argue that, if the jury assumed that Ms. Moscarelli would continue to receive pay raises commensurate with

what she had received in the past, she would have been awarded back pay of $244,582. Pl. Opp Br. at 20. But raises consistent with each previous year's inflation rate would yield a lower number. Using the inflation rate to calculate Ms. Moscarelli's foregone pay raises,[4] she would have earned $50,453.74 in 2003 (assuming, in the absence of discrimination, that she would have received a raise in 2003, but factoring in Ms. Moscarelli's 12 week maternity leave), $66,781.18, $68,984.96 in 2005, $54,914.67 in 2006 (factoring a 12 week maternity leave for Ms. Moscarelli's third child), $73,113.71 in 2007, and $48,869.32 through the end of the trial in 2008. (See Tr. 323, 325) (Ms. Moscarelli's testimony that her maternity leaves negatively affected her pay). This comes to a total of $363,117.58. Subtracting Ms. Moscarelli's actual earnings ($140,952) would leave missing back pay of S222,165.58. Because Ms. Moscarelli was already the head of her department (and thus, presumably, could no longer receive promotion), and had 17 years of experience, the Court believes that the standard inflation rate is

---

[4] See ftp://ftp.bls.gov/pub/special.requests/cpi/cpiai.txt; Ramsay v. Cooper, 553 F.2d 237, 240 (1st Cir. 1977) (taking judicial notice of inflation); see also Associated Indem. Corp. v. Fairchild Industries, Inc., 961 F.2d 32, 36 (2d Cir. 1992) (citing Ramsay with approval in noting that cost estimates accepted by district court failed to consider inflation). It should be noted that Defendants ask the Court to calculate Ms. Moscarelli's back pay award based on an assumption of no salary increases throughout the applicable period, even to adjust for inflation. See Def. Br. at 21. But Defendants point to no evidence to justify such an assumption, which the Court considers to be wholly unreasonable.

the more appropriate metric to measure Ms. Moscarelli's foregone raises, rather than her previous average annual salary increase. See, generally, Whittlesey v. Union Carbide Corp., 742 F.2d 724, 727 (2d Cir. 1984) (finding no error in the trial court considering "the effects of inflation" in determining a back pay award).[5]

Given a fuller evidentiary record, the Court would probably not award Ms. Moscarelli the full S222,165.58 as her rightfully owed back pay. Among other things, Ms. Moscarelli herself testified that she turned down a full-time job because it would have required her to pay more for child care. (Tr. 356). And, to the extent that Ms. Moscarelli's termination and subsequent part-time (rather than full-time) employment enabled her to save on child care expenses, these savings served to mitigate Ms. Moscarelli's termination damages.[6] The problem is that Defendants

---

[5] Ms. Moscarelli did earn $10,666.58 in severance pay, which served to mitigate her damages. Pl. Ex. 90 at ¶ 51. The Court understands this sum to have been included in the $41,863 listed as Ms. Moscarelli's earnings in 2003. See Pl. Ex. 93. If the Court is mistaken, Defendants may move for reconsideration on the limited question of whether Ms. Moscarelli's back pay award should be reduced by $10,666.58.

[6] In this regard, the Court disagrees with the Fourth Circuit's decision in E.E.O.C. v. Service News Co., 898 F.2d 958, 964 (4th Cir. 1990), which held that forgone child care expenses do not serve to mitigate damages under Title VII. The Fourth Circuit reasoned that a defendant "should not escape liability for back pay" because their wrongful termination saved the plaintiff child care expenses. But there is a corollary: Title VII does not authorize a plaintiff to receive a "windfall" simply because they are unlawfully terminated. See Zakre v. Norddeutsche Landesbank Girozentrale, 541 F. Supp. 2d 555, 567 (S.D.N.Y. 2008) (back pay award "should not result in a plaintiff

15

failed to introduce any evidence concerning how much money Ms. Moscarelli saved on child care by not working full-time. And, as Defendants bore the burden to show Ms. Moscarelli's mitigation, the Court cannot speculate as to how much Ms. Moscarelli saved on child care or other expenses by working part-time.[7]

Thus, the Court awards Ms. Moscarelli back pay of S222,165.58.

IV. Ms. Moscarelli's Punitive Damages Award

Defendants also object to the jury's $500,000 punitive damages award to Ms. Moscarelli. Defendants contend that: (1) the evidence does not support awarding Ms. Moscarelli punitive damages; and (2) at a minimum, the punitive damage award must be reduced to the statutory $50,000 cap set by 42 U.S.C. § 1981a(b)(3).

Defendants' argument concerning whether punitive damages

---

receiving a windfall"). To the extent that being terminated saves a plaintiff substantial sums, then the opportunity cost of not working serves to mitigate damages just like a replacement job would. So, just as a defendant can "escape liability" when a wrongfully terminated plaintiff mitigates her damages by finding a suitable new job, so too should a defendant face reduced liability because the termination enables the plaintiff to forego costly expenses, such as child care.

[7] Defendants' failure to introduce evidence concerning Ms. Moscarelli's mitigation of damages arguably constitutes an improper "windfall" for Ms. Moscarelli. See Zakre, 541 F. Supp. 2d at 567. But this windfall is somewhat counterbalanced by Ms. Moscarelli's failure to seek pre-judgment interest on her back pay award. See, generally, Gierlinger v. Gleason, 160 F.3d 858, 873-874 (2d Cir. 1998) (noting that, when a successful plaintiff so moves, "it is ordinarily an abuse of discretion not to include pre-judgment interest" in an award of lost wages).

should have been awarded at all is easily disposed of. Plaintiffs introduced substantial evidence concerning the Firm's mistreatment of women generally, and pregnant women in particular. See supra 5-6. Given this evidence, a reasonable jury could have believed that Defendants acted "with malice or with reckless indifference to [Ms. Moscarelli's] federally protected rights." Kolstad v. American Dental Ass'n, 527 U.S. 526, 529-30, 119 S. Ct. 2118, 144 L. Ed. 2d 494 (1999); Tse v. UBS Financial Services, Inc., 568 F. Supp. 2d 274, 308 (S.D.N.Y. 2008) (on a judgment as a matter of law, the Court reviews whether to award punitive damages based upon what "the jury could reasonably have found").[8]

On the other hand, Defendants' statutory cap argument is meritorious. Section 1981a(b)(3) clearly imposes a $50,000 limit on punitive damage awards against defendants who employ more than 14 but fewer than 101 employees. See also Cush-Crawford v. Adchem Corp., 271 F.3d 352, 357 (2d Cir. 2001). And here, Plaintiffs themselves acknowledged that the Firm employed "approximately 20 individuals." Compl. ¶ 5.

Thus, pursuant to 42 U.S.C. § 1981a(b)(3), the Court

---

[8] Plaintiffs ask that the Court use a higher "manifest injustice" standard, because Defendants did not specifically seek judgment as a matter of law on the punitive damages question prior to the issue being submitted to the jury. The Court disagrees. Defendants moved for a complete judgment in their favor. This, ipso facto, means that Defendants sought a legal ruling that they did not discriminate at all, and thus, could not have discriminated maliciously or with reckless indifference.

reduces the punitive damage award to $50,000.

V.    Jacquelyn Todaro's Equal Pay Act Award

    A.    Ms. Todaro's Back Pay

Defendants also contest the jury's award of $16,499.75 to Jacquelyn Todaro as back pay damages under the Equal Pay Act.  In contrast to Title VII, the jury's back pay award under the Equal Pay Act was not advisory.  See, generally, Bonner v. Guccione, 178 F.3d 581, 589 (2d Cir. 1999) (noting that trial court instructed jury that it could award back pay under Equal Pay Act claim, but not under Title VII, and ultimately remanding to district court to calculate attorney fee award based on jury's $10,000 back pay award under Equal Pay Act); Broadus v. O.K. Industries, Inc., 226 F.3d 937 (8th Cir. 2000) (affirming back pay award based on jury verdict); Brinkley-Obu v. Hughes Training, Inc., 36 F.3d 336 (4th Cir. 1994) (same).  Thus, the Court reviews the jury's award under the standards set forth in FED. R. CIV. P. 50.

Defendants argue that, at most, the jury should have only awarded Ms. Todaro the difference between her salary in 2003 and that of the highest paid male associate, Rob Litt, pro-rated through May 23, 2003.  This, Defendants argue, would have totaled $7,880.  The Court largely agrees.

As an initial matter, the Court notes that the jury found for Defendants on Ms. Todaro's Title VII claim, but for Ms. Todaro on her Equal Pay Act claim.  The Equal Pay Act's scope is

significantly narrower than Title VII's. Title VII prohibits sex discrimination generally. 42 U.S.C. § 2000e-2(a)(1). Conversely, the Equal Pay Act provides relief only if an employer pays employees of one sex "at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d); <u>Kovacevich v. Kent State Univ.</u>, 224 F.3d 806, 828 (6th Cir. 2000) (noting that, while "[g]enerally, a Title VII claim of wage discrimination parallels that of an EPA violation . . . . due to the more demanding threshold of showing a comparator in the EPA context, claims for sex-based wage discrimination can be brought under Title VII even though no member of the opposite sex holds an equal but higher paying job") (internal quotations and citations omitted). In providing for relief only if pay is unequal (i.e., "at a rate less" than "employees of the opposite sex"), the Equal Pay Act does not prohibit other kinds of sex discrimination. <u>See</u>, <u>generally</u>, <u>Ryduchowski v. Port Authority of New York and New Jersey</u>, 203 F.3d 135, 142 (2d Cir. 2000) ("The Equal Pay Act, passed by Congress in 1963, prohibits employers from discriminating among employees on the basis of sex by paying higher wages to employees of the opposite sex for 'equal work'") (internal citations and quotations omitted). Thus, nothing in the statute prevents an employer from

failing to hire or promote or, to some extent, even give raises on the basis of sex – those protections are found in Title VII, a claim that Ms. Todaro lost.

It follows then that Ms. Todaro only has an Equal Pay Act claim to the extent that she received wages "at a rate less" than "employees of the opposite sex" even if, in the absence of all discrimination, Ms. Todaro should have earned substantially more than any comparable male employee. And, accordingly, Ms. Todaro's damages must be based on a comparison either to a specific man, or, possibly, to a statistical composite of the Firm's similarly skilled male employees who performed similar work. See, generally, Lavin-McEleney v. Marist College, 239 F.3d 476, 480-81 (2d Cir. 2001) (expressing no opinion on whether a plaintiff must identify a specific comparator of the opposite sex, and holding that the jury could consider statistical evidence of pay discrepancies).

Here, the jury awarded Ms. Todaro $16,499.75 in back pay for the period of January 1, 2003 through May 24, 2003. Because Ms. Todaro's actual salary during this period was $76,875 annually, the jury's award assumed that – but for discrimination – Ms. Todaro would have been earning $118,697.28 per year. But Ms. Todaro failed to identify either a specific male associate or a statistically composite male associate that earned anywhere near this kind of salary. Thus, the jury's award is clearly erroneous and not supported by the evidence. Indeed, based on the amount

awarded, it seems likely that the jury improperly awarded Ms. Todaro back pay based not on a comparison to any man (real or statistical), but in comparison to Ms. Todaro herself, had she received a hypothetical salary increase in January 2003 instead of a salary cut. And, as Defendants note, the only man that Ms. Todaro compared herself to at trial was Robert Litt, who earned an annual salary of $97,379 in 2003. Thus, Ms. Todaro's Equal Pay Act damages must be based on the degree to which she received wages "at a rate less" than Mr. Litt. 29 U.S.C. § 206(d).

The Court disagrees, however, with how Defendants calculated Ms. Todaro's damages based on Mr. Litt's salary. Defendants argued that, because Ms. Todaro worked "approx. 20 weeks" she should receive 20/52 of the differential between her and Mr. Litt's annual salary. But, because the Court knows the exact length of time that the Firm paid Ms. Todaro; it does not need to "approximate" anything. In addition, there are not precisely 52 weeks in a year. Accordingly, the Court believes it is more appropriate to award Ms. Todaro 144/365 of the difference between her annual salary and Mr. Litt's, as she was paid through May 24, 2003 (the 144th day of a 365 day year). This works out to $8,089.25. Thus, the Court orders a remittitur of Ms. Todaro's compensatory damages to $8,089.25. Ms. Todaro has until October 30, 2009 to decide whether to accept this reduced damage award or seek a new trial.

B.   <u>Liquidated Damages</u>

Plaintiffs argue that under 29 U.S.C. § 216(b), a plaintiff who succeeds on an Equal Pay Act claim is entitled to "an additional equal amount as liquidated damages." Thus, Plaintiffs seek a doubling of Ms. Todaro's award.

As an initial matter, the Court notes that § 216(b)'s plain text does not appear to authorize a liquidated damage award in this case. By its plain text, § 216(b)'s liquidated damages provision applies only to awards based on plaintiffs' "unpaid minimum wages, or their unpaid overtime compensation" – not to Equal Pay Act violations. But, at least within the Second Circuit, Plaintiff's interpretation has prevailed over § 216(b)'s plain meaning.[9] <u>See</u> <u>Pollis v. New School for Social Research</u>, 132 F.3d 115, 120 (2d Cir. 1997) (Equal Pay Act compensatory damage award "should be doubled pursuant to the Fair Labor Standards Act's liquidated damages provision"); <u>Ebbert v. Nassau County</u>, 05-CV-5445, 2009 WL 935812, *2 (E.D.N.Y. 2009). And Defendants did not meet their burden to avoid liquidated damages liability, as

---

[9] Some authorities have held that § 216(b) authorizes damages only for "willful" violations. <u>See</u>, <u>e.g.</u>, <u>Perdue v. City Univ. of New York</u>, 13 F. Supp. 2d 326, 333 (E.D.N.Y. 1998). These holdings appear to be based on a misunderstanding of Second Circuit precedent. <u>Perdue</u>, for example, cited <u>Pollis</u> for its holding. But <u>Pollis</u> discussed "willful" violations in the context of statute of limitations issues – not liquidated damage awards. 132 F.3d at 120. And § 216(b) itself requires liquidated damage payments for "violations," without regard to whether such violations are "willful."

Defendants did not demonstrate "good faith" and "reasonable grounds for believing that [their] act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended."  29 U.S.C. § 260(b); Reich v. Southern New England Telecommunications Corp., 121 F.3d 58, 71 (2d Cir. 1997) (noting that a defendant's burden under § 260 is "a difficult one to meet").

Thus, the Court must double Ms. Todaro's compensatory damage award.  If Ms. Todaro accepts the Court's remittitur, this would mean $8,089.25 in liquidated damages, for a total award of $16,178.50.

<u>CONCLUSION</u>

Defendants' motion for judgment as a matter of law is GRANTED IN PART AND DENIED IN PART.  The Court does not disturb the jury's finding of Defendants' liability on Ms. Moscarelli's Title VII claim.  However, as the jury's back pay award was only advisory, the Court modifies it by increasing it to S222,165.58. The Court also does not disturb the jury's finding of liability for punitive damages on Ms. Moscarelli's Title VII claim.  However, the Court reduces the jury's punitive damage award to the $50,000 statutory cap set forth in 42 U.S.C. § 1981a.  The Court does not believe the jury's back pay award to Ms. Todaro on her Equal Pay Act claim is supported by the evidence.  The Court orders a remittitur of that award to $8,089.25.  Ms. Todaro has until October 30, 2009 to decide whether to accept this reduced damage

award or seek a new trial. The Court finds that Ms. Todaro is entitled to liquidated damages equal to her compensatory damages on her Equal Pay Act claim. If Ms. Todaro accepts the Court's remittitur, this means she is entitled to liquidated damages in the amount of $8,089.25, for a total award of $16,178.50.

The Clerk of the Court is ordered to mark this matter as closed.

SO ORDERED

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:    Central Islip, New York
          September  25 , 2009

24